UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

JAMAL A. DAVIS,

           Petitioner,

v.

MARTIN BITER, Warden, Kern Valley State
Prison,

           Respondent.

Case No. 12cv3001-BEN (BLM)

**REPORT AND RECOMMENDATION
FOR ORDER DENYING PETITION
FOR WRIT OF HABEAS CORPUS**

[ECF No. 26]

      This Report and Recommendation is submitted to United States District Judge Roger T. Benitez pursuant to 28 U.S.C § 636(b) and Civil Local Rules 72.1(d) and HC.2 of the United States District Court for the Southern District of California.  On November 14, 2012, Petitioner, Jamal Ahbaki Davis, a state prisoner proceeding *pro se*, commenced these habeas corpus proceedings pursuant to 28 U.S.C. § 2254.  ECF No. 1.  On December 5, 2013, Petitioner filed a First Amended Petition for Writ of Habeas Corpus ("Petition"), which is the operative pleading in this case, challenging his state court conviction for conspiracy to commit murder.  ECF No. 26 ("Pet.").  Respondent answered on August 20, 2014.  ECF No. 43 ("Ans.").  Petitioner did not file a Traverse, which was due on September 22, 2014. See ECF No. 40 at 2.

This Court has considered the Petition and the Answer, and all supporting documents filed by the parties.  For the reasons set forth below, this Court **RECOMMENDS** that Petitioner's First Amended Petition for Writ of Habeas Corpus be **DENIED**.

## FACTUAL AND PROCEDURAL BACKGROUND

The following facts are taken from the California Court of Appeal's opinion in <u>People v. Jamal Ahbaki Davis</u>, Appeal No. D056502.  <u>See</u> Lodgment 6.  This Court presumes the state court's factual determinations to be correct, absent clear and convincing evidence to the contrary.  28 U.S.C. § 2254(e)(1); <u>Miller-El v. Cockrell</u>, 537 U.S. 322, 340 (2003); <u>see also</u> <u>Parke v. Raley</u>, 506 U.S. 20, 35 (1992) (holding findings of historical fact, including inferences properly drawn from such facts, are entitled to statutory presumption of correctness).

On October 12, 2007 (10 days before the shooting of Wyatt and Winston), West Coast Crips gang member Leroy Henderson was killed in a shooting believed to have been committed by a Lincoln Park gang member. Defendant and his brother were close to Henderson; he was like an uncle to them. A wake for Henderson was held on October 22, and the Wyatt/Winston shooting occurred that night.

Wyatt and Winston were shot at about 9:00 p.m. at a playground located by the John Adams apartment complex.  The two victims were at the playground with Wyatt's fiancée (Donielle Holloway), Holloway's mother (Cherry Mason), and several other adults and children.  Winston, Holloway, and Mason testified at trial about the shooting.

These witnesses saw three 17-to-19-year-old males approach the playground where the adults were watching the children play.  Two of the males were wearing dark "hoodies" with the hoods up, and one of the males was wearing a white t-shirt.  The males were whispering to each other and looking at Wyatt.  Winston thought the three males did not "look right" and that they "were up to something."  The male wearing the white t-shirt asked, "'Where you all from?'" which meant what gang did they claim.  Before they had time to answer, the males started shooting.  The witnesses were not certain how many guns were involved in the shooting, but stated there were at least two.[1]

Wyatt was fatally shot in the head and neck, with one bullet imbedding in his spine.  Winston was shot in the arm, with the bullet shattering a bone in his arm.  None of the victims or their companions had

_____

[1] At trial Winston testified that he thought the man in the white t-shirt pulled out a gun; however, his preliminary hearing testimony suggested that he thought the men with the hoodies were the ones shooting guns.  Holloway testified that after the man with the white t-shirt spoke to them, the other two started shooting.

any gang involvement.  However, the John Adams apartment complex where the shooting occurred was an area where Lincoln Park gang members congregated.

The night of the Wyatt/Winston shooting, the police patrolled the area looking for suspects.  At about 1:00 a.m. they saw three males walking on Willie James Jones Avenue and then in an alley by Imperial Avenue, an area claimed by the Lincoln Park gang.  When the males saw the police following them, they began running away.  The police caught two of the males, Ware and defendant's twin brother (Jamel).  Jamel (like defendant) is a West Coast Crips gang member, and Ware is a member of an ally of the West Coast Crips (the Neighborhood Crips).  The police found several items discarded in the areas where the three males had been running, including a dark-colored sweatshirt and two loaded handguns (a .45 caliber semiautomatic and a .22 caliber revolver) that were determined to be guns used in the Wyatt/Winston shooting.  The police also found a backpack containing an unloaded shortened shotgun, five shotgun rounds, and a .22 caliber bullet.  The police found DNA matching the DNA of defendant or his brother on the .45 and .22 handguns.

The police conducted several lineups seeking to obtain identification evidence from the witnesses of the Wyatt/Winston shooting, with varying results.[2]  At trial, Winston and Holloway testified that defendant looked similar to one of the assailants.

The police determined that defendant was the third person who had fled in the alley the night of the shooting, and they arrested him the next day at Henderson's funeral.  Thereafter, defendant gave his version of the events in a recorded statement to the police and in his trial testimony. Defendant admitted that he was present during the Wyatt/Winston shooting. He stated that he was the individual wearing the white t-shirt, and that he walked up to the playground with West Coast Crips gang members Bandy and Wanton.  Defendant's brother stayed in the car with two other individuals about one block away.  Defendant knew that Bandy and Wanton had guns; however, defendant did not have a gun and did not know Bandy and Wanton were planning to shoot anyone.[3]

Defendant explained that the events unfolded as follows.  On October 11 he, Jamel, Bandy, and several others beat up Lincoln Park gang member, Antonio Davis (Antonio).  That same night Antonio shot and killed Henderson.  At Henderson's wake on October 22, older West Coast Crips gang members reprimanded defendant and his brother for beating up Antonio and causing Henderson's death, and the older members told

---

[2] At a curbside lineup with Ware, Jamel, and a third individual apprehended during the police pursuit in the alley, Holloway identified Ware and Jamel as perhaps being among the assailants, but she was not sure. In photographic lineups, she identified defendant, Jamel, and Wanton as possibly being the males wearing the hoodies.  At the preliminary hearing, she selected Ware and Jamel (but not defendant) as among the assailants.

Winston was unable to make an identification during one photographic lineup, explaining that he was not 100 percent sure.  In another photographic lineup, he identified Wanton as the assailant in the white t-shirt, whereas in a third photographic lineup he identified Jamel as the assailant in the white t-shirt.

[3] Defendant told the police that he did not hear anyone ask the victims where they were from.

defendant and his brother they had to retaliate.[4]   Defendant knew that unless he retaliated or made his gang think he had retaliated, he could not go into certain areas of West Coast Crips territory without being disciplined (i.e., beaten or killed).

After the wake, defendant and several others (including Jamel, Bandy, and Wanton) were at a park.   Defendant provided somewhat different descriptions of the discussions at the park in his recorded statement to the police as compared to his trial testimony.   In his recorded statement, he stated that people at the park started talking about having their guns and going to "do this" that night; Wanton said they should go to the John Adams apartments because he knew some people there who were "slipping"[5]; and defendant and his brother were going to go home but Wanton said they should "roll" with them because they were all "homies."   Defendant accompanied Wanton and the others because they expected him to, given that they were doing something for his uncle and because he was playing the "tough guy."   When they arrived at the area, he thought they were going to go inside the apartment complex, but then he heard a gunshot in the playground area.

At trial, defendant testified that while at the park they were drinking alcohol and talking about the older gang members' attitude towards them, but they did not formulate a plan to retaliate against Lincoln Park and there was no discussion about doing a shooting at the John Adams apartments. When they were at the park, Wanton offered to take defendant and others to Wanton's grandmother's house, but stated he first had to make a stop, which defendant assumed was for purposes of Wanton's drug dealing activities.   When they arrived at the apartments, Bandy and Wanton did not have their guns out, and defendant thought they were going to the apartments for Wanton's drug dealing activity.   As they were walking, Wanton complained about a person who was harassing him for selling drugs there.   Wanton stated the person might be over by the playground, and defendant walked to the playground because he knew the person and thought he might be able to stop a confrontation.   When defendant heard gunshots he dropped to the ground in surprise, thinking that maybe he was being shot at.   He then joined others and ran to the car.

In both his recorded statement and trial testimony, defendant acknowledged that he knew Wanton and Bandy had guns and that something could happen, but stated he did not know what was going to happen and he did not have any intention of doing anything.   Defendant stated he did not want Bandy or Wanton to shoot anyone at the John Adams apartments.

After the shooting, Wanton drove defendant and the others to Wanton's grandmother's home.   They talked about having to hide the guns, and defendant and his brother offered to take the guns.   Defendant told the police he offered to take the gun because he did not feel safe, explaining it

---

[4] Antonio worked with the Crips gang in drug transactions and, unbeknownst to defendant, the Crips gang did not want him to be attacked.

[5] A prosecution expert testified that "slippin[g]" meant having your guard down.

was "getting really hot around the streets" and he did not want to be shot. At trial, defendant testified that Wanton asked him if they wanted to do a shooting, and defendant decided to pretend that he was going to do this because of the pressure from his gang to retaliate. Accordingly, defendant took the .45 and his brother took the .22, and they stated they were going to go on a "mission" for the gang.

Wanton dropped off defendant and his brother near a friend's home, but the friend did not answer his phone, so they began to walk to the Harbor View Apartments where they knew a lot of people.[6] They met up with Ware, and told him they were going to "do a mission." Defendant testified that he hoped Ware would tell the older Crips gang members that he and his brother were on their way to do a shooting. They went with Ware to the Harbor View apartments to get Ware's backpack containing his shotgun.[7] The trio continued walking, looking for "any type of thuggish looking person" to shoot. Defendant told the police and testified at trial that they saw people on the street who looked like gang members who they could have shot, but they did not approach anyone. He claimed he had no intention of actually shooting anyone.

A prosecution gang expert testified that gang members are expected to "'put in work,'" including shootings and retaliation for killings of gang members by a rival gang. The expert opined that the Wyatt/Winston shooting was gang related, based on facts showing a gang challenge before the shooting (i.e., asking the victims where they were from), the shooting was in an area frequented by the Lincon Park gang, and the shooting occurred after a wake for a West Coast Crips gang member. Further, prosecution gang experts opined that if West Coast Crips or allied gang members were in rival Lincoln Park territory at 1:00 a.m. with guns and after the recent commission of other murders between the gangs, this meant they were on a mission hunting for a Lincoln Park gang member to shoot and kill.

Lodgment 6 at 3-9.

On August 6, 2009, the District Attorney of San Diego County filed an amended information charging Petitioner with (1) murder of Ricky Wyatt (Cal. Penal Code § 187(a)); (2) attempted murder of Philemon Winston Cortez (Cal. Penal Code §§ 664, 187(a)); (3) conspiracy to commit murder (relating to the Wyatt/Winston shooting) (Cal. Penal Code § 182(a)(1)); and (4) conspiracy to commit murder (relating to the conduct after the Wyatt/Winston shooting) (Cal. Penal Code § 182(a)(1)). Lodgment 1 at 208-11. With

---

[6] A prosecution expert testified that the Harbor View apartments is a headquarters for the West Coast Crips gang. The complex is located about seven blocks from Willie James Jones Avenue, which is in Lincoln Park gang territory. The expert explained that these areas claimed by the West Coast Crips and Lincoln Park gangs are adjacent to each other.

[7] At trial, defendant testified that Ware did not agree to go on the mission with them. Defendant testified that Ware told them he had something to show them, and when they went to the Harbor View apartments, Ware showed them his shotgun and asked them to help him steal a car.

regard to counts 1 and 2, it was alleged that Petitioner was a principal, and that at least one principal personally used a firearm and proximately caused death or great bodily injury and death to a person other than an accomplice (Cal. Penal Code § 12022.53(d), (e)(1)). Id. at 208-09. It was further alleged as to counts 1 through 4, that the charged offenses were committed to benefit a criminal street gang (Cal. Penal Code § 186.22(b)(1)). Id. at 208-11.

Following a trial, on August 21, 2009, the jury acquitted Petitioner of the crimes charged in counts 1 through 3, and convicted him of conspiracy to commit murder charged in count 4 (Cal. Penal Code § 182(a)(1)). Id. at 444, 533-38. The jury also found true an allegation that Petitioner committed the crime for the benefit of a criminal street gang (Cal. Penal Code § 186.22(b)(1)). Id. at 538. On December 11, 2009, the trial court sentenced Petitioner to an indeterminate term of 25-years-to-life. Id. at 444, 542.

On August 27, 2010, Petitioner appealed his conviction to the California Court of Appeal arguing that (1) Petitioner's Fourteenth Amendment due process rights were violated because the evidence was insufficient to support his conviction for conspiracy to commit murder; (2) Petitioner was denied his constitutional rights to due process and a fair trial and his trial resulted in a miscarriage of justice because the trial court erred in failing to instruct the jury on voluntary manslaughter as a lesser included offense to murder in count 1; and (3) Petitioner's sentence of 25-years-to-life for conspiracy to commit murder constituted a disproportionate sentence in violation of the ban against cruel and unusual punishment under the state and federal constitutions. See Lodgments 2, 4, 5. On June 28, 2011, the California Court of Appeal affirmed the trial court's judgment in a written opinion. Lodgment 6. Petitioner subsequently filed a petition for review in the California Supreme Court raising the same claims that he raised in his appeal to the California Court of Appeal. See Lodgment 7; see also Lodgments 2, 4, 5. On August 31, 2011, the California Supreme Court summarily denied the petition without comment or citation to authority. Lodgment 8. Petitioner did not file any state habeas petitions seeking collateral relief. Pet. at 3.

On November 14, 2012, Petitioner filed his initial federal petition asserting the following claims: (1) his sentence constituted cruel and unusual punishment under the

Eighth Amendment; (2) the trial court erred by failing to instruct the jury on lesser charges; (3) there was insufficient evidence supporting the verdict; and (4) trial counsel rendered ineffective assistance. ECF No. 1. On January 3, 2013, District Judge Benitez dismissed the petition without prejudice due to Petitioner's failure to pay the requisite filing fee and allege complete exhaustion of his state court remedies. ECF No. 3. On March 26, 2013, Petitioner filed a Petition for Writ of Habeas Corpus asserting the same four claims as asserted in his initial petition. See ECF No. 8; see also ECF No. 1. On June 25, 2013, Respondent filed a Motion to Dismiss arguing that the petition was untimely. ECF No. 16. On October 2, 2013, this Court issued a Report and Recommendation ("R&R") recommending that the district court deny Respondent's Motion to Dismiss, find a mixed petition, and issue an options order in lieu of dismissal. ECF No. 18. On November 14, 2013, District Judge Benitez adopted this Court's R&R, informed Petitioner of his options for proceeding with a mixed petition, and ordered Petitioner to file a declaration stating how he wished to proceed with his federal petition. ECF No. 23.

On December 5, 2013, Petitioner filed a First Amended Petition for Writ of Habeas Corpus, raising the same four claims that he raised in his Petition for Writ of Habeas Corpus. See Pet.; see also ECF No. 8. On February 18, 2014, Petitioner filed a Motion to Stay, indicating that he wished to use the "stay and abeyance" procedure, and on February 20, 2014, Respondent opposed the motion. ECF Nos. 31 & 32. On May 7, 2014, this Court issued an R&R recommending that the district court deny Petitioner's motion for stay and abeyance and require Petitioner to file a motion either asking the Court to dismiss the unexhausted claim (Claim Four) or to dismiss the entire petition because it contained both exhausted and unexhausted claims. ECF No. 33. On May 30, 2014, Petitioner filed a Reply to Respondent's Opposition on Motion to Stay and an Objection to this Court's R&R. ECF Nos. 37 & 38. On June 25, 2014, District Judge Benitez adopted this Court's R&R, denied Petitioner's Motion for Stay and Abeyance, and granted Petitioner's request to dismiss his unexhausted claim (Claim Four). ECF No. 39. On July 9, 2014, this Court issued an order requiring Respondent to respond to Claims One, Two and Three. ECF No. 40.

## **SCOPE OF REVIEW**

Title 28 of the United States Code, section 2254(a), sets forth the following scope of review for federal habeas corpus claims:

> The Supreme Court, a Justice thereof, a circuit judge, or a district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States.

28 U.S.C. § 2254(a).

The Petition was filed after enactment of the Anti-terrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. No. 104-132, 110 Stat. 1214. Under 28 U.S.C. § 2254(d), as amended by AEDPA:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim–
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

In making this determination, a court may consider a lower court's analysis. Ylst v. Nunnemaker, 501 U.S. 797, 803-04 (1991) (authorizing a reviewing court to look through to the last reasoned state court decision).  Summary denials are presumed to constitute adjudications on the merits unless "there is reason to think some other explanation for the state court's decision is more likely." Harrington v. Richter, 131 S.Ct. 770, 784-85 (2011).

A state court's decision is "contrary to" clearly established federal law if the state court: (1) "applies a rule that contradicts the governing law set forth in [Supreme Court] cases"; or (2) "confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [Supreme Court] precedent." Williams v. Taylor, 529 U.S. 362, 405-06 (2000).

A state court's decision is an "unreasonable application" of clearly established federal law where the state court "'identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.'" Lockyer v. Andrade, 538 U.S. 63, 75 (2003) (quoting Williams, 529 U.S. at 413). "[A] federal habeas court may not issue [a] writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must be objectively unreasonable." Id. at 75-76 (citations and internal quotation marks omitted). Clearly established federal law "refers to the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision." Williams, 529 U.S. at 412.

If the state court provided no explanation of its reasoning, "a habeas court must determine what arguments or theories supported or . . . could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the Supreme Court]." Harrington, 131 S.Ct. at 786. In other words, a federal court may not grant habeas relief if any fairminded jurist could find the state court's ruling consistent with relevant Supreme Court precedent.

Finally, habeas relief also is available if the state court's adjudication of a claim "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2); Wood v. Allen, 558 U.S. 290, 293 (2010). A state court's decision will not be overturned on factual grounds unless this Court finds that the state court's factual determinations were objectively unreasonable in light of the evidence presented in state court. See Miller-El, 537 U.S. at 340; see also Rice v. Collins, 546 U.S. 333, 341-42 (2006) (the fact that "[r]easonable minds reviewing the record might disagree" does not render a decision objectively unreasonable). This Court will presume that the state court's factual findings are correct, and Petitioner may overcome that presumption only by clear and convincing evidence. See 28 U.S.C. § 2254(e)(1); Schriro v. Landrigan, 550 U.S. 465, 473-74 (2007).

# DISCUSSION

## Ground One.  Cruel and Unusual Punishment

Petitioner argues that his 25-years-to-life sentence for conspiracy to commit murder is cruel and unusual punishment in violation of the Eighth Amendment. Pet. at 6.  In support, Petitioner contends that during the Willie James Jones Avenue incident that resulted in his conspiracy to commit murder conviction, no shots were fired, no one was approached or hurt, and there was no victim.  Id.  Petitioner further alleges that he had no actual knowledge nor was an active participant of the conspiracy to commit murder, because "being pressured to do a shooting and pretending to follow along for 'appearance sake' is not enough to support" his conviction.  Id.  Respondent alleges that the state court reasonably rejected Petitioner's claim.  See Ans. at 30, 40.

Because the California Supreme Court summarily denied Petitioner's petition for review on direct appeal (Lodgment 8), this Court must look through to the Court of Appeal's decision as the last reasoned state court decision on this claim.  See Ylst, 501 U.S. at 801-06.  In considering Petitioner's claim based on the United States Constitution, the state appellate court found that Petitioner's sentence did not violate the Eighth Amendment's prohibition against cruel and unusual punishment.  See Lodgment 6 at 14, 17.  The appellate court stated that a "sentence violates the federal Constitution if it is grossly disproportionate to the severity of the crime," and further examined relevant California law.  Id.  The state appellate court then concluded that Petitioner was aware that his conduct created a high risk to human life, thereby warranting a lengthy punishment, and explained why Petitioner's sentence was not disproportionate to the sentences imposed on his accomplices.  Id. at 15-17.

The Eighth Amendment dictates that cruel and unusual punishments shall not be inflicted.  U.S. Const. Amend. VIII.  A criminal sentence constitutes cruel and unusual punishment if it is grossly disproportionate to the crimes committed.  Lockyer v. Andrade, 538 U.S. 63, 71 (2003).  The Court stated that in evaluating "term-of-years sentences," such as the one at issue in this case, a reviewing court must consider "all of the circumstances of the case to determine whether the sentence is unconstitutionally excessive."  Graham v. Florida,

560 U.S. 48, 59 (2010).  The Court emphasized that this analysis "does not require strict proportionality between crime and sentence but rather forbids only extreme sentences that are grossly disproportionate to the crime." Id. at 60 (internal quotations omitted).  The Court explained that in determining  whether a sentence is grossly disproportionate, the analysis

> must begin by comparing the gravity of the offense and the severity of the sentence. . . .  "[I]n the rare case in which [this] threshold comparison . . . leads to an inference of gross disproportionality" the court should then compare the defendant's sentence with the sentences received by other offenders in the same jurisdiction and with the sentences imposed for the same crime in other jurisdictions. . . .  If this comparative analysis "validate[s] an initial judgment that [the] sentence is grossly disproportionate," the sentence is cruel and unusual.

Id. (internal citations omitted).  The Ninth Circuit has observed that "the precise contours of this principle are unclear, and it has been applied only in exceedingly rare and extreme circumstances." Crosby v. Schwartz, 678 F.3d 784, 791 (9th Cir. 2012).

Because the California Court of Appeal correctly identified and utilized the appropriate federal law, this Court only is required to determine whether the state court's decision was "'contrary to, or involved an unreasonable application of,' this clearly established gross disproportionality principle." Lockyer, 538 U.S. at 73.  As previously stated, the jury found Petitioner guilty of conspiracy to commit murder (Cal. Penal Code § 182(a)(1)), and found true the allegation that Petitioner committed the crime for the benefit of a criminal street gang (Cal. Penal Code § 186.22(b)(1)).  Lodgment 1 at 444, 538.  The trial court sentenced Petitioner to an indeterminate term of 25-years to life. Id. at 444, 542.

Initially, the Court notes that Petitioner has not identified any case that indicates that a 25-years-to-life sentence for conspiracy to commit murder is a grossly disproportionate sentence.  Rather, a review of cases in the Ninth Circuit reveals that courts have upheld the constitutionality of similar sentences for similar crimes. See Contreras v. Yates, 2011 WL 1134446, at *8-9 (E.D. Cal. March 25, 2011) (denying constitutional challenge to a 50-years-to-life sentence imposed on an eighteen-year-old defendant convicted, inter alia, of a conspiracy to commit murder, where defendant was motivated by revenge when he shot at random members of a rival gang, was involved in planning and carrying out the offense, and

had been involved in gangs for several years before the offense); see also Rodriguez v. Yates, 2009 WL 1212102, at *10-11 (E.D. Cal. May 5, 2009) (denying Eighth Amendment challenge to a 25-years-to-life sentence for conspiracy to commit murder).

Further, ample law and facts support the California Court of Appeal's decision. The initial analysis requires a court to consider the gravity of the offense and the severity of the sentence. Graham, 560 U.S. at 60. The appellate court concluded that Petitioner was aware that his conduct created a high risk of death, thereby supporting a lengthy punishment. Lodgment 6 at 15-16. In reaching this conclusion, the appellate court noted that Petitioner admitted that he knew about the gang's orders to retaliate for the killing of Leroy Henderson, and that Wanton and Bandy had guns when he accompanied them to the John Adams apartments, and further admitted that he and his brother agreed to take the guns used in the John Adams apartments shooting and go on a mission to commit another shooting. Id. The state appellate court also observed the following:

> By finding defendant guilty of count 4 conspiracy to commit murder, the jury rejected his claim that he did not intend to actually shoot someone when he went on this mission. The fact that he did not target a particular victim does not diminish the threat to human life created by his conduct; indeed, Wyatt and Winston were not targeted beforehand and they are no less dead or injured. If the police had not thwarted defendant while he was walking in the alley with the gun, there could have been other shooting victims.

Id. at 15-16. As discussed in more detail in the Court's analysis of the sufficiency of the evidence claim below, the appellate court's factual summary is supported by the trial record. Petitioner armed himself with a weapon that had just been used by his fellow gang members to commit shootings and a murder, and joined other armed gang members on a hunt to shoot more individuals in a rival gang territory. See Lodgments 1 at 247-54, 267-69; 9 at 267-68, 1042-43, 1227-28, 1232-34. As pointed out by Respondent, Petitioner had an interest in murdering rival gang members in order to retaliate for the murder of his fellow gang member and/or to regain respect in his gang for causing the murder of Henderson. See Ans. at 54. Because there is ample evidence supporting the conclusion that Petitioner's

1   conduct created a high risk of death, the fact that the sentence is severe[8] does not establish

2   gross disproportionality.

3        Petitioner also appears to argue that his sentence is grossly disproportionate when

4   compared to the eight year sentence received by his accomplice Rashad Ware.  See Pet. at

5   6, 8.  A defendant cannot prove a constitutional violation simply by demonstrating that his

6   sentence is disproportionate to those received by other similarly situated defendants.  See

7   Contreras, 2011 WL 1134446, at *9 (citing Pulley v. Harris, 465 U.S. 37, 50-51 (1984)).  Even

8   if such a comparison could support a constitutional violation, there are significant differences

9   between Petitioner and Ware.  Ware was not present during the shooting of Wyatt and

10  Winston, while Petitioner was.  See Lodgments 1 at 402; 6 at 16; 9 at 1621.  In addition,

11  Ware admitted his involvement and accepted legal responsibility by pleading guilty to

12  conspiracy to commit assault with a deadly weapon and a gang enhancement, whereas

13  Petitioner contested his guilt, elected to proceed to trial, and was convicted of conspiracy to

14  commit murder.  Lodgments 1 at 377, 401-02; 6 at 16.  As such, the Court agrees with the

15  state appellate court's conclusion that in light of the "evidence of the heightened level of

16  [Petitioner's] involvement in the gang violence, as well as the absence of the mitigating

17  circumstance of an early acknowledgment of wrongdoing," a comparison of Petitioner's

18  sentence to the sentence received by his accomplice "does not establish a grossly

19  disproportionate or shocking punishment."  See Lodgment 6 at 16-17.

20       In conclusion, this Court finds that Petitioner's case is not "the rare case" in which the

21  sentence imposed is grossly disproportionate to the crimes committed.  Because Petitioner's

22  sentence does not violate the Eighth Amendment's prohibition against cruel and unusual

23  punishment, the California Court of Appeal's decision was not contrary to nor an

24  unreasonable application of clearly, established Supreme Court precedent, nor did it

25

26       [8]  Although a sentence of 25-years-to-life is a severe sentence, it is not the most severe sentence
    because Petitioner retains the opportunity for parole.  See Solem, 463 U.S. at 297 (the opportunity for parole
27  is an important factor in determining the harshness of the penalty); Norris v. Morgan, 622 F.3d 1276, 1290-91
    (9th Cir. 2010) (the possibility of parole creates a significantly less severe sentence than a sentence where
28  parole is not a possibility); Lockyer, 538 U.S. at 74 (considering the fact that the defendant "retains the
    possibility of parole").

1  constitute an unreasonable factual determination.  28 U.S.C. § 2254(d).  This Court therefore

2  **RECOMMENDS** that Petitioner's claim in Ground One be **DENIED**.

3  **Ground Two.  The Trial Court's Alleged Failure to Instruct on Lesser Included**

4  **Offense**

5  In Ground Two, Petitioner asserts that his Fifth, Sixth and Fourteenth Amendment

6  rights were violated when the trial court failed to instruct the jury on voluntary manslaughter

7  "committed on sudden quarrel or heat of passion" as a lesser included offense of murder

8  charged in count 1.  See Pet. at 7.  In support, Petitioner argues that although he was

9  ultimately acquitted of the charge in count 1, the trial court's alleged instructional error

10  caused or contributed to his conviction for conspiracy to commit murder in count 4.  Id.

11  Petitioner thus asserts that the alleged error was not harmless, resulted in a miscarriage of

12  justice, and violated his state and federal rights to due process and a fair trial.  Id.

13  Respondent argues that the trial court's alleged failure to instruct is not a federal

14  claim, and thus should be dismissed.  Ans. at 41-42.  To the extent federal due process

15  requires a trial court to give a lesser included offense instruction, Respondent submits that

16  such instruction is required only when the evidence warrants it.  Id. at 42.  Respondent

17  argues that the evidentiary record in this case does not establish that Winston or Wyatt, the

18  victims of the John Adams apartment complex shooting, quarreled with Petitioner and his

19  accomplices or provoked them prior to the shooting, or that any passion upon which

20  Petitioner may have acted upon was "the direct and immediate influence of that provocation."

21  Id. at 45.  In support, Respondent contends that the evidence demonstrates that the victims

22  of the shooting, their friends and children were not armed, did not belong to a gang, and

23  were socializing in a park, and thus did not "arouse feelings of homicidal rage or passion in

24  an ordinary reasonable person."  Id. (citation omitted).  Respondent further alleges that

25  because the jury was instructed on a second degree murder, the jurors had a choice in

26  evaluating Petitioner's culpability.  Id at 46 (citing Schad v. Arizona, 501 U.S. 624, 646-48

27  (1991)).  Respondent thus asserts that Petitioner is not entitled to federal habeas relief on

28  this claim.  Id. at 40-41, 46.

1    Petitioner presented his instructional error claim to the California Supreme Court in a

2  petition for review, which was summarily denied without a statement of reasoning or citation

3  of authority.  Lodgments 7 at 16-21; 8.  Petitioner presented this claim to the California Court

4  of Appeal.  See Lodgments 2 at 23-29; 4 at 11; 5 at 11-15.  The state appellate court denied

5  the claim in a reasoned opinion.  Lodgment 6 at 13-14.  The Court will therefore look through

6  the silent denial by the state supreme court to the appellate court's opinion.  Ylst, 501 U.S.

7  at 804 n.3.  The appellate court stated the following:

8      Defendant argues the trial court erred in rejecting his request to instruct
       on voluntary manslaughter based on heat of passion as a lesser included
9      offense of count 1 murder (the shooting of Wyatt).  Although defendant was
       acquitted of the murder of Wyatt, he asserts the instructional error caused
10     prejudice to the jury's guilty verdict on count 4 conspiracy to commit murder
       based on his subsequent conduct of hunting for another victim.  Defendant
11     points to evidence showing that he was extremely emotional on the day of the
       shooting; he was in turmoil because his gang held him responsible for
12     Henderson's death; and he described the shooting as spontaneous and
       unexpected.  He argues that if the jury had been instructed on a heat of
13     passion theory for the murder, it might have inferred that he did not have the
       intent to kill while subsequently walking in the vicinity of Willie James Jones
14     Avenue.

15        . . .

16     The lesser offense of voluntary manslaughter based on heat of passion
       requires a showing of provocation caused by the victim or by conduct
17     reasonably believed to have been engaged in by the victim. *(People v.
       Manriquez, supra*, 37 Cal.4th at p. 583.)  Here, there was no evidence that the
18     victim, or those associated with the victim, had engaged in provocative
       conduct.  The victims were at the playground with family and friends talking
19     and watching the children play.  Although the victims were in an area
       frequented by gang members, they were not gang members and there was no
20     evidence that defendant could reasonably conclude they were gang members.
       Even assuming arguendo that a jury could find that defendant was operating
21     under a heat of passion and that the instructions on count 1 might have
       affected the verdict on count 4, absent evidence of provocation associated with
22     the victim, the trial court properly refused to instruct on voluntary
       manslaughter.

23

24  Lodgment 6 at 13-14.

25    To the extent that Petitioner alleges that the state trial court  violated state law when

26  it failed to instruct the jury on the lesser included offense of voluntary manslaughter based

27  on heat of passion, the claim is not subject to federal habeas review.  Only claims alleging

28  a violation of "the Constitution or laws or treaties of the United States" are cognizable on

federal habeas review.  See 28 U.S.C. § 2254(a); Estelle v. McGuire, 502 U.S. 62, 67-68 (1991) (stating that "it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions."); Matylinsky v. Budge, 577 F.3d 1083, 1094 n.4 (9th Cir. 2009) (same).

To the extent Petitioner alleges that the omission violated his federal constitutional rights, this Court will consider the claim.  See 28 U.S.C. § 2254(d).  There is, however, no clearly established federal law on this issue because the United States Supreme Court expressly declined to rule on whether a trial court's failure to instruct on a lesser included offense in a non-capital case violates the federal constitution.  See Beck v. Alabama, 447 U.S. 625, 638 n.14 (1980); see also Powell v. Hatcher, 407 Fed.App'x 226, 227 (9th Cir. 2011) (denying habeas relief and noting that in Beck, the Supreme Court expressly declined to rule on the issue); Huynh v. Hernandez, 2007 WL 186307, at *1 (9th Cir. Jan. 22, 2007) (failure to instruct on lesser offense of involuntary manslaughter did not merit habeas relief; "there is no 'clearly established' Supreme Court law that requires giving a lesser included offense instruction in a non-capital case.") (citations omitted); United States v. Rivera–Alonzo, 584 F.3d 829, 834 n.3 (9th Cir. 2009) ("In the context of a habeas corpus review of a state court conviction, we have stated that there is no clearly established federal constitutional right to lesser included instructions in non-capital cases.") (citation omitted).  Therefore, under the standard of review set forth in 28 U.S.C. § 2254(d), habeas relief is unavailable on this claim as this Court cannot say that the state appellate court "unreasonabl[y] appli[ed] clearly established Federal law, as determined by the Supreme Court of the United States."  See 28 U.S.C. § 2254(d).

Additionally, while "the defendant's right to adequate jury instructions on his or her theory of the case might, in some cases, constitute an exception to the [foregoing] general rule," that is not the situation here.  See Solis v. Garcia, 219 F.3d 922, 929 (9th Cir. 2000); see also Clark v. Brown, 450 F.3d 898, 904 (9th Cir. 2006) (state court's jury instructions violate due process if they deny the criminal defendant "a meaningful opportunity to present a complete defense") (quoting California v. Trombetta, 467 U.S. 479, 485 (1984)).  The Due

Process Clause entitles a defendant to "an instruction as to any recognized defense for which there exists evidence sufficient for a reasonable jury to find in his favor." See Hagenno v. Yarborough, 253 F.App'x 702, 704 (9th Cir. 2007) (quoting Mathews v. United States, 485 U.S. 58, 63 (1988)); see also Bradley v. Duncan, 315 F.3d 1091, 1098-99 (9th Cir. 2002). However, failure to instruct on a defense theory amounts to an error only if "the theory is legally sound and the evidence in the case makes [the theory] applicable." Clark v. Brown, 450 F.3d 898, 904-05 (9th Cir. 2006) (citation omitted).

In this case, before declining to give the requested voluntary manslaughter instruction, the trial judge summarized the defense theory as follows: "[Petitioner] had no knowledge of anything.  He went [to the John Adams apartment complex] simply to aid and abet a drug deal.  And, much to his surprise, shooting broke out, and he didn't know anything about it." Lodgment 9 at 1391.  Petitioner's trial counsel agreed with the judge's summary of the defense theory, but argued that Petitioner was nevertheless entitled to the jury's consideration of "whether or not this was a deliberate act or a premeditated act or whether it was spontaneous sort of act in the heat of passion, based on the pitched emotions . . . ." Id.  The trial judge responded that "passion for revenge" did not qualify as the "heat of passion," that there was no evidence of a "sudden quarrel" with the people in the park, nor any provocation from those people.  Id. at 1391-93.  The trial judge then denied Petitioner's request for a lesser included offense of voluntary manslaughter instruction noting the following:

> [T]he court is required to instruct on lessers if the evidence shows the defendant is guilty of a lesser included offense and there is substantial evidence to merit consideration from the jury.  That's where I get stuck.  Substantial evidence, in this context, is evidence from which a jury composed of reasonable persons could conclude that the lesser and not the greater was committed. And speculation is insufficient basis on which to give—to require the giving of an instruction.  And that's essentially what we're doing here.  We're speculating.

Id.  As such, even if the jurors believed that Petitioner was not aware of what was going to happen at the John Adams apartment complex that night, Petitioner has not shown that he was denied instructions consistent with such theory. See Clark, 450 F.3d at 904-05 (9th Cir.

2006) (failure to instruct on a defense theory amounts to an error only if "the theory is legally sound and the evidence in the case makes [the theory] applicable."). Moreover, Petitioner has not provided anything other than mere speculation that the failure to instruct on the lesser offense as to the murder charged in count 1 impacted in any way the jury's decision to convict Petitioner of the conspiracy to commit murder charged in count 4.

Because there is no U.S. Supreme Court law requiring a trial judge to instruct on a lesser included crime in a non-capital case like this one, the state court's rejection of Petitioner's claim of instructional error was not contrary to, nor an objectively unreasonable application of, any clearly established federal law, nor an unreasonable determination of the facts in light of the evidence presented. Accordingly, this Court **RECOMMENDS** that Petitioner's second ground for relief be **DENIED**.

### Ground Three. Sufficiency of the Evidence

Petitioner alleges that his Fourteenth Amendment due process rights were violated because the evidence was insufficient to support his conviction for conspiracy to commit murder charged in count 4. Pet. at 8. Petitioner argues that the evidence linking him to the conspiracy was based on "suspicion," and that his mere association with a gang was not sufficient to sustain a charge of conspiracy. See id. Petitioner further appears to argue that the Court should modify the judgment to reduce his conviction to conspiracy to commit assault with a deadly weapon.[9]   See id.

---

[9] Petitioner states that the "jurors should [have] been instructed on lesser charges than conspiracy to commit murder [] in count 4," such as conspiracy to commit assault with a deadly weapon. Pet. at 8. Petitioner did not raise this claim in his appeals to the California Court of Appeal and the California Supreme Court. See Lodgments 2, 4, 5, 7. However, Petitioner argued in his appeals to the California courts that the judgment should be modified to reduce his conviction to conspiracy to commit assault with a deadly weapon. See Lodgments 2 at 12-14, 21-22; 4 at 9-10; 5 at 9-10; 7 at 15. This Court must liberally construe pleadings by *pro se* litigants. See Haines v. Kerner, 404 U.S. 519, 520 (1972) (instructing that courts must construe *pro se* habeas filings liberally); Allen v. Calderon, 408 F.3d 1150, 1153 (9th Cir. 2005) (same). The Court will thus construe the Petition liberally and consider Petitioner's argument that his judgment should be modified to reduce his conviction to conspiracy to commit assault with a deadly weapon. Although Respondent does not specifically address this argument, Respondent incorporates the California Court of Appeal's ruling addressing this claim. See Ans. at 50 (quoting Lodgment 6 at 12-13). The state appellate court concluded that in light of the intense rivalry between Petitioner's gang, the West Coast Crips, and the Lincoln Park Bloods gang, which resulted in the murders of Henderson and Wyatt, the jury reasonably could have concluded that Petitioner intended to retaliate for Henderson's murder with a murder of a rival gang member, and not merely an assault.

1    Respondent contends that there was substantial evidence to support Petitioner's

2 conviction for conspiracy to commit murder as charged in count 4, regardless of Petitioner's

3 acquittal of the charges in counts 1 and 2.  Ans. at 54.  In support, Respondent alleges that

4 Petitioner "had an interest in killing rival gang members either in retaliation for the murder

5 of his own fellow gang member or in order to regain respect in his gang for bringing on that

6 murder."  Id.  Respondent further argues that Petitioner's statements to the police and

7 conduct after the shooting at the John Adams apartments establish that he "harbored malice

8 for the duration of the conspiracy."  Id.  Respondent thus contends that the state appellate

9 court's rejection of Petitioner's claim of insufficiency of the evidence was reasonable and

10 habeas relief should be denied.  See id.

11    Because the California Supreme Court summarily denied Petitioner's petition

12 (Lodgment 8), the Court must look through the silent denial to the California Court of

13 Appeal's opinion (Lodgment 6 at 9-13).  Ylst, 501 U.S. 804 n.3.  The California Court of

14 Appeal found that substantial evidence supported Petitioner's conspiracy to commit murder

15 conviction.  Lodgment 6 at 13.  In reaching this decision, the state appellate court stated the

16 following:

17    Defendant argues there was no evidence that he had the specific intent
    to agree with a coconspirator to murder a rival gang member as he was
18    walking in the area of Willie James Jones and Imperial Avenues.  To the
    contrary, the jury could reasonably infer that he specifically intended to agree
19    to shoot a Lincoln Park gang member in retaliation for the killing of Henderson.
    The evidence showed that a West Coast Crips gang member (Henderson) had
20    been shot in what was believed to be a retaliatory shooting by a Lincoln Park
    gang member.    Several days later West Coast Crips gang members
21    (accompanied by defendant) shot persons in an area frequented by Lincoln
    Park gang members (the John Adams apartments).  That same night defendant
22    and two other West Coast Crips gang members or allies were found walking in
    an area claimed by Lincoln Park with the same guns used during the previous
23    shooting committed by the Crips.  Defendant admitted that he was expected

24

25 Lodgment 6 at 12-13.  By challenging the state appellate court's refusal to modify Petitioner's judgment,
    Petitioner essentially argues that the state court misapplied state law.  As such, Petitioner does not raise a
26 constitutional claim that is subject to federal habeas review.  See 28 U.S.C. § 2254(a); Estelle v. McGuire, 502
    U.S. 62, 67-68 (1991) ("[I]t is not the province of a federal habeas court to reexamine state-court
27 determinations on state-law questions."); Matylinsky v. Budge, 577 F.3d 1083, 1094 n.4 (9th Cir. 2009) (same).

28

to retaliate for the Henderson killing or face discipline from his gang, and admitted that he told his fellow gang members that he was going on a shooting mission for his gang. Although defendant claimed he was merely *pretending* to agree to this mission, the jury was not required to credit this claim. The jury could reasonably conclude that defendant intended to agree with others to go on the shooting mission in order to comply with his gang's retaliation order and protect himself from a gang-imposed disciplinary action.

To support his challenge to the sufficiency of the evidence, defendant points out that he was acquitted of the offenses committed at the John Adams apartment complex; there was no evidence that anyone was approached by him or his companions; and no evidence of an intent to commit a crime against a specific individual. These factors do not defeat the jury's finding of guilt on count 4. The fact that the jury found reasonable doubt as to defendant's guilt of the Wyatt/Winston shooting does not mean that the jury was required to credit his claim of innocent intent concerning the shooting mission. A jury "may believe and accept as true only part of a witness's testimony and disregard the rest." (*In re Daniel G.* (2004) 120 Cal.App.4th 824, 830.) The jury could reasonably reject defendant's assertion that he was feigning the shooting mission. The fact that he did not actually approach or target a specific person did not require the jury to conclude that he did not plan to commit a shooting with the intent to kill. Defendant stated they were looking for a gang-type person to shoot, and the jury could infer that if the police had not interrupted them in the alley they would have carried out their mission to shoot and kill someone in Lincoln Park territory.

Defendant also asserts that the mere fact he was walking in rival gang territory does not support the conspiracy finding because the evidence showed that West Coast Crips gang members often frequented territory claimed by the Lincoln Park gang without any crimes being committed. The evidence supporting the jury's finding is not based merely on his conduct of walking in Lincoln Park territory. Rather, it is supported by the totality of the circumstances, including the ongoing feud and shootings occurring between the Lincoln Park and West Coast Crips gangs, defendant's admissions that there was a retaliation order from his gang and that he agreed to go on a shooting mission, the late night hour, and his possession of a gun while walking in Lincoln Park territory.

Id. at 10-12 (emphasis in original).

The clearly established federal law regarding sufficiency of the evidence claims in the criminal context is set forth in Jackson v. Virginia, 443 U.S. 307 (1979). Jackson claims face a high bar in federal habeas proceedings. Coleman v. Johnson, 132 S.Ct. 2060, 2062 (2012). In Jackson, the Court held that the Fourteenth Amendment's Due Process Clause is violated, and an applicant is entitled to habeas corpus relief, "if it is found that upon the record evidence adduced at the trial no rational trier of fact could have found proof of guilt beyond a reasonable doubt." Jackson, 443 U.S. at 324. In making this determination, habeas courts must respect "the province of the jury to determine the credibility of witnesses, resolve

evidentiary conflicts, and draw reasonable inferences from proven facts by assuming that the jury resolved all conflicts in a manner that supports the verdict." Walters v. Maass, 45 F.3d 1355, 1358 (9th Cir. 1995). "[C]ircumstantial evidence and inferences drawn from it may be sufficient to sustain a conviction." United States v. Cordova Barajas, 360 F.3d 1037, 1041 (9th Cir. 2004) (quoting United States v. Reyes–Alvarado, 963 F.2d 1184, 1188 (9th Cir. 1992)). "Although it might have been possible to draw a different inference from the evidence, [a federal habeas court is] required to resolve that conflict in favor of the prosecution." Ngo v. Giurbino, 651 F.3d 1112, 1115 (9th Cir. 2011); see also Coleman, 132 S.Ct. at 2062 (stating that "a federal court may not overturn a state court decision rejecting a sufficiency of the evidence challenge simply because the federal court disagrees with the state court.  The federal court instead may do so only if the state court decision was 'objectively unreasonable.'") (quoting Cavazos v. Smith, 132 S.Ct. 2, 4 (2011) (per curiam)); Jackson, 443 U.S. at 326 ("[A] federal habeas corpus court faced with a record of historical facts that supports conflicting inferences must presume—even if it does not affirmatively appear in the record—that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution.").  Federal habeas courts also must analyze Jackson claims "with explicit reference to the substantive elements of the criminal offense as defined by state law." Chein v. Shumsky, 373 F.3d 978, 983 (9th Cir. 2004) (en banc) (quoting Jackson, 443 U.S. at 324 n.16).  When assessing the evidence presented at trial, a reviewing court must conduct a thorough review of the state court record. Jones v. Wood, 114 F.3d 1002, 1013 (9th Cir. 1997).

The Ninth Circuit has made clear that "[a]n additional layer of deference is added to this standard by 28 U.S.C. § 2254(d), which obliges [Petitioner] to demonstrate that the state court's adjudication entailed an unreasonable application of the quoted *Jackson* standard." Briceno v. Scribner, 555 F.3d 1069, 1078 (9th Cir. 2009) (citing Juan H. v. Allen, 408 F.3d 1262, 1274 (9th Cir. 2005)).  In Juan H., the Ninth Circuit first reviewed the standard of review applied by the state appellate court to a sufficiency of the evidence claim, and found that although the state court did not cite to the relevant federal case law, "such a citation is

1   not required 'so long as neither the reasoning nor the result of the state-court decision

2   contradicts' Supreme Court precedent." Id. at 1275 n.12 (quoting Early v. Packer, 537 U.S. 3,

3   8 (2003) (per curiam)).  Accordingly, it falls to this Court to determine whether the state

4   appellate court opinion "reflected an unreasonable application of *Jackson* . . . to the facts of

5   this case." Juan H., 408 F.3d at 1275 (internal quotation omitted).

6        Petitioner was convicted of the conspiracy to commit murder charged in count 4 in

7   violation of Cal. Penal Code § 182(a)(1).  Lodgment 1 at 444, 538.  The trial court

8   instructed the jury on the elements of the crime as follows:

9        1.  The defendant intended to agree and did agree with one or more of
     other persons: Donald Bandy, Curtis McNeely, Jamel Davis, or Olayo Justiz to
10    intentionally and unlawfully kill;

11       2.  At the time of the agreement, the defendant and [one or more of]
     the other alleged member[s] of the conspiracy intended that one or more of
12    them would intentionally and unlawfully kill;

13       3.  The defendant Jamal Davis, Donald Bandy, Greg Wanton, Curtis
     McNeely, Jamel Davis, or Olayo Justiz or (both/all) of them . . . committed [at
14    least one of] the following overt act[s] alleged to accomplish the killing:

15   . . .

16   Incident two: Willie James Jones Avenue Acts–Count 4

17       OVERT ACT NO.(01): On or about October 22, 2007, JAMEL DAVIS,
     JAMAL AHBAKI DAVIS, and RASHAD WARE walked in the vicinity of Willie
18    James Jones Avenue.

19       OVERT ACT NO.(02): On or about October 22, 2007, JAMEL DAVIS,
     JAMAL AHBAKI DAVIS, and RASHAD WARE walked down an alley in the
20    vicinity of 4900 Imperial Avenue.

21       OVERT ACT NO.(03): On or about October 22, 2007, JAMEL DAVIS
     carried a firearm.

22
         OVERT ACT NO.(04): On or about October 22, 2007, JAMAL AHBAKI
23    DAVIS carried a firearm.

24       OVERT ACT NO.(05): On or about October 22, 2007, RASHAD WARE
     carried a firearm.

25   AND

26       4.  At least one of these overt acts[s] was committed in California.

27

28   Id. at 353-54.  Petitioner's challenge to the sufficiency of the evidence appears to center

on the first and second elements—whether Petitioner had the specific intent to agree and did agree with at least one coconspirator to commit murder.  See Pet. at 8.

The trial record in this case contains substantial evidence supporting the jury's determination that Petitioner conspired with his fellow gang members to commit murder, as charged in count 4.  Petitioner was interviewed by the police on October 30, 2007, and the recorded interview was played for the jury.  See Lodgments 1 at 217-80; 9 at 560-62.  Petitioner also testified at his trial.  Lodgment 9 at 1175-1207, 1209-1380.  Petitioner's own statements and testimony provide substantial evidence supporting the verdict.

Petitioner admitted during his trial testimony that he and his brother Jamel belonged to the West Coast Crips gang.  See id. at 1180, 1237, 1240.  Petitioner testified that on October 11, 2007, he and other members of the West Coast Crips got into a fight with Antonio Davis, a well-known Lincoln Park gang member, and that later that night, Leroy Henderson, whom Petitioner considered to be his uncle, was killed.  See id. at 1189-90, 1270-73.  In his police interview, Petitioner explained that "a lot of gang members" came to Henderson's wake, that they were emotional and angry, and that they discussed getting weapons and retaliating for Henderson's death.  See Lodgment 1 at 217, 226-30.  At trial, Petitioner further explained that members of the West Coast Crips believed that Petitioner's fight with Davis led to Henderson's murder and they pressured Petitioner to retaliate or suffer the consequences.  See Lodgment 9 at 1191-92, 1195, 1199, 1276-78, 1287-90.

Petitioner admitted during both his trial testimony and his police interview that after Henderson's wake, he and other members of the West Coast Crips, including Bandy and Wanton, drove to the John Adams apartments and that he was present when Wanton and Bandy started shooting at people.  See id. at 1197-1207, 1216-24, 1296-98, 1325-26; Lodgment 1 at 219-20, 222, 233, 264, 267.  Petitioner explained during his police interview that he, Bandy, and Wanton walked into the park where the shooting took place, while three other accomplices waited in the car.  See Lodgment 1 at 219-20, 222, 233, 264, 267.  Petitioner said that Bandy was armed with a 45 caliber gun and Wanton with a revolver, and that he knew something could happen and that "[m]ost likely, [Bandy and Wanton

1   were] going to start shooting." Id. at 223-24, 234, 265.  After the shooting, Petitioner and

2   his accomplices ran back to the car and drove away.  Id. at 240-41.

3        During trial, Petitioner testified that after the Winston/Wyatt shootings, Petitioner

4   and his accomplices went to Wanton's grandmother's house, where they ate pizza, drank

5   alcohol, and discussed doing another shooting. Lodgment 9 at 1225-27.  Petitioner claimed

6   that although he did not want to shoot anyone, he knew that he was in trouble with the

7   gang, and he wanted to make it look like he was "down with them and cool with them" and

8   that he planned to go on a "mission."  Id. at 1227-28, 1231, 1338-41.  Petitioner testified

9   that he and his brother Jamel took the weapons used during the earlier shooting,[10] met up

10  with Ware, informed Ware that they "w[ere] going to do a mission," and then went with

11  Ware to get a shotgun for Ware.  Id. at 1227-28, 1230-34, 1339-40, 1345-47.  Petitioner

12  testified that the trio walked around the area of Willie James Jones Avenue looking for a car

13  to steal.  Id.  Petitioner testified that they had no intention of shooting a Lincoln Park

14  Bloods gang member, but were only acting as if they were going to do so.  See id. at 1234-

15  35; see also id. at 1231.

16       Although Petitioner testified at trial that he had no intention of shooting a rival gang

17  member and was only pretending to be going on a "mission" when he, his brother, and

18  Ware went to the Willie James Jones Avenue area at 1 a.m. armed with guns, Petitioner's

19  recorded police statement portrayed his intent in a completely different light.  See id., see

20  also Lodgment 1 at 247-48, 250-54, 268-69, 271.  For example, Petitioner stated during his

21  police interview that after he and his brother Jamel met Ware, Petitioner told Ware that

22  they were "looking for some shit," and were going "to shoot somebody."  Lodgment 1 at

23  247-48, 268-69.  Petitioner further admitted that he, his brother, and Ware subsequently

24  walked around the Willie James Jones Avenue area looking for "any type of thuggish

25  looking person":

26  _____

27       [10] Petitioner admitted during his police interview that Bandy gave him the .45 and Wanton gave the
     .22 revolver to Petitioner's brother.  Lodgment 1 at 267-68.  Petitioner also stated that Ware asked him and
28  his brother to come to the Harbor View apartments to get a shotgun, which Ware subsequently brought in a
     backpack.  Id. at 249-50.

Q1:  Looking for people still?
A:  Yeah, let's just walk and maybe (unintelligible) and stuff.
Q1:  To find somebody.
A:  Yeah.  We seen so much people . . .
Q1:  Mm-hm.
A:  We seen like tall people, people like with the[ir] little sister, like people with a stroller.  Like grown people.  Cars . . .
Q1:  Who are you looking for?
A:  Like, we be looking for like, I don't – I'm not sure.  Any, any type of – any type of like, *any type of thuggish looking person.*
Q1:  Young, black, knows their gangsters . . .
A:  Yeah . . . .

Id. at 250-51 (emphasis added).  Petitioner also stated that: "I want[ed] to do something. . . . *We got a plan, the first person we see, we just gonna shoot 'em up.*"  Id. at 271 (emphasis added).  Petitioner further admitted during his police interview that he and his accomplices then walked down the alley, saw the police, and started running away, and although Petitioner escaped, he tore his shirt and dropped the gun when he was scaling a fence.  Id. at 252-54.

Petitioner's recorded police statement and trial testimony establish that the West Coast Crips gang members blamed Petitioner for causing the murder of their fellow gang member, Leroy Henderson, because Petitioner had a fight with a rival Lincoln Park Bloods gang member, Antonio Davis, whom the West Coast Crips gang blamed for killing Henderson. As such, the jurors could have concluded that the Winston/Wyatt shooting was executed by the West Coast Crips in retribution for the Henderson killing.  Furthermore, because Petitioner was present at the Wyatt/Winston shooting, took the gun used during the shooting, stated that he was going on a "mission" and that he was going "to shoot somebody," and walked around the Willie James Jones Avenue area looking for a "thuggish looking person" to shoot, the jurors reasonably could have concluded that Petitioner would have murdered a rival gang member had he found a suitable victim before the police interrupted his plans.  As such, there was substantial evidence supporting the jury's conclusion that Petitioner conspired to kill a rival gang member in order to retaliate for Henderson's murder, as well as to regain his gang's respect and to protect himself from his gang's disciplinary action.

This conclusion was corroborated by the testimony of several police officers who testified as gang experts during Petitioner's trial.  For example, Johnny F. Keene, a police detective with the San Diego Police Gang Unit, testified that Petitioner, his brother Jamel, and Leroy Henderson were documented West Coast Crips gang members, and that Petitioner had admitted to being a West Coast Crips gang member.[11]  Lodgment 9 at 868-70, 888, 892-95, 1036-38.  Detective Keene testified that it was "suspected" that the shooter who killed Henderson was a Lincoln Park Bloods gang member.  Id. at 895.  Keene explained that gang members are expected to "put in work," including shootings and murders, in order to retaliate against a rival gang for shooting or killing a member of their own gang.  Id. at 890.  Keene was presented with hypothetical facts similar to the facts surrounding the Winston/Wyatt shootings, and opined that the shootings were committed "for the benefit of or in association of a gang, particularly the West Coast Crips," and that the gang had to retaliate "in order to save face, in order to save respect."  Id. at 890, 897-99.  Detective Keene also explained the concept of "backing up" as follows: "[I]f a member of, say, West Coast were going to go do a shooting in retaliation for something a Blood set had done, a member of Neighborhood Crip may choose to roll with them to assist them in what they're doing."  See id. at 873-74, 1042-43.  Based on this testimony, the jurors could have concluded that Petitioner and his brother Jamel, both members of the West Coast Crips gang, agreed to commit a murder in order to retaliate for the murder of their fellow gang member, Leroy Henderson, and that Ware, a Neighborhood Crips gang member, accompanied them as "back up" to assist and assure the success of the mission.

Sergeant Van Cruz testified that he responded to a shooting call at the John Adams apartments and opined that the shooting was gang-related.  See id. at 243-44, 256-63. Sergeant Cruz explained that around 1:00 a.m., he drove northbound on Willie James Jones Avenue from Imperial Avenue and encountered three black males whose ages and clothing

---

[11] The jurors also heard other testimony establishing that gang-related photographs of Petitioner and his brother Jamel were seized from Petitioner's cell phone and computer.  See Lodgment 9 at 828-35, 841-42, 885-88, 890-92, 1039, 1058.

matched the description of the suspects involved in the shootings at the John Adams apartments.  See id. at 267, 270.  After a brief chase, Petitioner's brother Jamel and Ware were apprehended and arrested for weapons violations.  Id. at 268-70, 279-82.  Sergeant Cruz opined that if armed gang members were in a rival gang neighborhood at 1:00 a.m., they were "hunting for something or someone in order to commit some sort of gang violence or any sort of violence."  Id. at 288.

Additionally, Duane Malinowski, a police detective for the City of San Diego, testified that he investigated the homicide of West Coast Crips gang member Leroy Henderson and that the murder was believed to be gang-related.[12]  Id. at 384-85, 405-08.  Detective Malinowski stated that he responded to the shootings at the John Adams Apartments, that he subsequently started "checking neighboring areas for possible suspects," and that around 1:00 a.m. he saw three males matching the descriptions of the suspects from the shootings in the Willie James Jones area.  Id. at 397-98.  Malinowski further testified that two individuals wore "batting-type" gloves made out of tight leather and one suspect wore a hooded jacket.  Id. at 400.  Malinowski stated that "gangsters" often wear batting-type gloves to protect their knuckles during fights, and opined that if West Coast Crips members were in rival Lincoln Park gang territory at 1:00 a.m. wearing batting gloves and armed with weapons, their purpose was to shoot or murder someone:

> Q:  [D]o you have an opinion as to, hypothetically speaking, if members of a rival gang–West Coast Crips and/or Neighborhood Crips–were in the vicinity . . . [of] Willie James Jones Alley–wearing batting gloves, carrying weapons, pistols, shotguns; do you have an opinion as to what purpose they may be there for?
> A:  Yes.
>
> . . .
>
> Q:  And what's your opinion?
> A:  That they were there to do a shooting or a murder.
> Q:  What do you base your opinion on?
> A:  The hour at which they're out there; how they were dressed, with the– darker clothing, the gloves, the weapons; the fact that they're in a rival

_____

[12] Johnny F. Keene, a police detective with the San Diego Police Department, also testified that "it was suspected at the time that the shooter was a Lincoln Park gang member."  See Lodgment 9 at 868-69, 895, 1051-52.

neighborhood, Lincoln Park.  You don't normally find Crips, West Coast and/or Neighborhood, hanging out on that street or in that community, and with the recent murders that were there.

Id. at 420; see also id. at 400.  Furthermore, the DNA samples obtained from the .45 handgun and the revolver contained a mixture of DNA from at least three people, and Petitioner and his brother Jamel were included as possible contributors.  Id. at 525, 527. Additionally, the DNA recovered from the batting gloves established that the predominant DNA was consistent with the DNA obtained from Petitioner and his brother.  Id. at 531.  As such, while Petitioner testified at his trial that he did not intend to shoot a rival Lincoln Park gang member, Petitioner's recorded police statement and other evidence presented at his trial provide substantial evidence supporting the jury's conclusion that Petitioner had the requisite specific intent to agree and did agree with at least one coconspirator to commit murder.

Petitioner claims that the evidence linking him to the conspiracy was based on mere "suspicion," and that his association with a gang was not sufficient to sustain a charge of conspiracy to commit murder.  See Pet. at 8.  While the jury could have chosen to believe the evidence cited by Petitioner, it was not required to do so.  As summarized above, the trial record contains ample evidence from which the jurors reasonably could have concluded that Petitioner conspired to kill members of a rival gang in order to retaliate for Henderson's murder, as well as to regain respect of his gang for causing the murder and to protect himself from his gang's disciplinary action.  This Court must respect "the province of the jury to determine the credibility of witnesses, resolve evidentiary conflicts, and draw reasonable inferences from proven facts by assuming that the jury resolved all conflicts in a manner that supports the verdict."  Walters, 45 F.3d at 1358.  As such, Petitioner's challenge to the sufficiency of the evidence fails.

Viewing the evidence in the light most favorable to the prosecution, the Court finds that there was sufficient evidence from which the jury reasonably could have concluded that Petitioner conspired to commit murder, as charged in count 4.  See Jackson, 443 U.S. at 319 ("[T]he relevant question is whether, after viewing the evidence in the light most

favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.") (emphasis in original).  As a result, the state court's decision was not contrary to, and did not involve an unreasonable application of, clearly established federal law.  <u>See</u> 28 U.S.C. § 2254(d).  Accordingly, the Court **RECOMMENDS** that Petitioner's sufficiency of the evidence claim be **DENIED**.

### CONCLUSION AND RECOMMENDATION

In sum, this Court finds that Petitioner has failed to present any evidence suggesting that the California Court of Appeal's denial of his claims was contrary to, or an unreasonable application of, clearly established federal law.  <u>See</u> 28 U.S.C. § 2254(d).  Nor has Petitioner made any arguments that further factual development is necessary, such that an evidentiary hearing would be warranted.  <u>See</u> 28 U.S.C. § 2254(e)(2) (exceptions where an evidentiary hearing may be appropriate).  As such, this Court **RECOMMENDS** that Petitioner's First Amended Petition for Writ of Habeas Corpus be **DENIED**.

For all of the foregoing reasons, **IT IS HEREBY RECOMMENDED** that the District Judge issue an Order: (1) approving and adopting this Report and Recommendation, and (2) directing that Judgment be entered **DENYING** the Petition.

**IT IS HEREBY ORDERED** that any written objections to this Report must be filed with the Court and served on all parties **no later than <u>January 16, 2015</u>**.  The document should be captioned "Objections to Report and Recommendation."

**IT IS FURTHER ORDERED** that any reply to the objections shall be filed with the Court and served on all parties **no later than <u>February 13, 2015</u>**.  The parties are advised that failure to file objections within the specified time may waive the right to raise those objections on appeal of the Court's order.  See <u>Turner v. Duncan</u>, 158 F.3d 449, 455 (9th Cir. 1998).

**IT IS SO ORDERED**.

DATED:  December 19, 2014

BARBARA L. MAJOR
United States Magistrate Judge